IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERAN BEST, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   vs. | )   Case No. 09 C 7749 |
| | ) |
| STACEY BERARD f/k/a STACEY MALEC, | ) |
| TIMOTHY BOOGERD, CITY OF | ) |
| NAPERVILLE, A DAY WITH, INC., | ) |
| BOUTIQUE TV, INC. d/b/a THE GREIF | ) |
| COMPANY, and A&E TELEVISION | ) |
| NETWORKS, LLC, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Eran Best has sued the City of Naperville, two Naperville police officers, and several television production companies on claims arising from her arrest and resulting involuntary appearance on the television show *Female Forces*. Best alleges that she was depicted on the show without her consent in a way that caused her severe emotional distress. She asserts both federal and state law claims arising out of her arrest and depiction on the television show.

Defendants have moved to dismiss Best's Illinois Right of Publicity Act (IRPA) claim on First Amendment grounds. Defendants have also moved for summary judgment on Best's IRPA, right of privacy, and intentional infliction of emotional distress claims on statute of limitations grounds. For the reasons stated below, the Court grants the motion to dismiss and defers ruling on the motion for summary judgment pending

determination of whether counts 3 and 4 can survive the First Amendment analysis set forth in this decision.

## Background

The Court takes the following facts from the allegations in Best's first amended complaint and the parties' submissions on the motions. Defendants A Day With, Inc. (ADW) and Boutique TV, Inc. d/b/a The Greif Company (Greif) produce a television show called *Female Forces* that airs on the Biography Channel. The Biography channel is owned by defendant A&E Television Networks, LLC (A&E). *Female Forces* is an unscripted "reality" television series that follows female police officers as they perform their duties and interact with members of the public. According to Best's complaint, the show's producers claim that they obtain a signed release from every member of the public who appears on the show.

The City of Naperville participates in the *Female Forces* program pursuant to a city resolution authorizing it to enter into a contract with ADW. The contract gives the Naperville Police Department the right to review a rough cut of each episode of the show and to insist on removal of material from the episode if it chooses. The department must make such a request within five days of receipt of the rough cut; failure to reply within the five-day period is deemed to constitute approval of the rough cut.

On February 24, 2008, Best was driving in Naperville when she was pulled over by Naperville police officer Timothy Boogerd because the license plate on her car had an expired sticker. Boogerd took Best's driver's license and registration and returned to his vehicle while Best waited in her car. From his squad car, Boogerd requested that

2

Stacey Berard, a female Naperville officer who on that day was being accompanied by a *Female Forces* camera crew, join him at the scene.[1]  The wait for Berard and the *Female Forces* crew caused a thirty minute delay in the processing of Best's traffic stop.

Once Berard and the camera crew arrived on the scene, Boogerd and Berard approached Best's car and directed her to get out.  When Best asked what was going on, Berard identified herself as a police officer and stated that the television crew was filming a documentary about her.  Boogerd and Berard performed a field sobriety test on Best.  Best stated that she had consumed one beer three hours earlier, and she passed the field sobriety test.  Boogerd and Berard then informed Best that she was driving on a suspended driver's license and placed her under arrest.  They handcuffed Best and placed her in the back of Boogerd's squad car.  Boogerd and Berard then proceeded to search Best's car, finding a pipe and a small amount of marijuana.  After they completed the search, Boogerd transported Best to the Naperville police station while Berard waited at the scene for a tow truck to arrive to impound Best's car.

While Boogerd was transporting Best to the police station, he informed her that if she did not sign a written consent form, the footage of her arrest would not be shown on the *Female Forces* television show.  Once Best arrived at the Naperville police station, a *Female Forces* producer approached her and urged her to sign a written consent form to allow the footage of her arrest to be used on the television show.  Best repeatedly refused to sign a consent form.

---

[1]  At the time, Berard's last name was Malec.

Despite the fact that Best never signed a consent form, footage of the events surrounding her arrest was broadcast during an episode of *Female Forces*. The segment includes footage of the field sobriety test and Best's arrest, including the moment when she is placed in handcuffs. Best's face is visible, and her voice is audible throughout this footage.

The segment also includes scenes in which Best is not on camera. One scene shows Boogerd and Berard searching Best's car while bantering about her expensive taste. Berard says that Best likes Coach purses, bags, and shoes, and Boogerd comments that Best was driving a Jaguar. In another scene, Berard is shown in her squad car driving to the scene, speaking directly to the camera. At one point, as Berard is speaking to the camera, the camera focuses on a dashboard computer, on which information about Best – including her date of birth, height, weight, driver's license number, and brief descriptions of previous arrests and traffic stops – is displayed. After the scene showing Best's arrest, the camera again films Berard in her squad car, and she says, "Do I feel sorry for [Best]? No. Pretty little blond girl, 25 years old, driving a Jaguar - yeah, that's Naperville."

The *Female Forces* episode featuring Best was first broadcast on the Biography Channel on December 7, 2008. It has been re-broadcast thirty times on that channel since December 14, 2008. Defendants made the episode available on the iTunes online store for digital download between December 8, 2008 and December 14, 2009. During several time intervals, the episode was also available for online viewing, or "streaming," on the In Demand website.

Best filed suit against the defendants on December 14, 2009. She asserts six

4

claims in her first amended complaint.  In count 1, she alleges that defendants violated her federal constitutional rights to privacy and freedom from unreasonable search and seizure when they "staged, sensationalized, and/or enhanced" her arrest and broadcast it without her consent.  In count 2, she alleges that ADW, Greif, and A&E (collectively, the "media defendants") used her identity for commercial purposes without her consent, in violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30.  In count 3, she alleges that all the defendants invaded her privacy under Illinois common law by publicly disclosing private facts about her.  In count 4, she asserts a claim of intentional infliction of emotional distress under Illinois law.  In count 5, she alleges that the city of Naperville violated the Illinois Personal Information Protection Act when it allowed the computer screen showing her personal information to be broadcast on the *Female Forces* program.  In count 6, Best alleges that the defendants violated the federal Driver's Privacy Protection Act, 18 U.S.C. § 2722(a), by disclosing her driver's license number in conjunction with her name when they broadcast the computer screen shot from the squad car.

Best's original complaint asserted the same federal and state law claims.  On February 12, 2010, defendants moved to dismiss several of the state law claims on various grounds.  On June 11, 2010, the Court denied the motion with regard to counts 2, 3, and 4.  *Best v. Malec*, No. 09 C 7749, 2010 WL 2364412 (N.D. Ill. June 11, 2010).  The Court dismissed count 5 with prejudice.  *Id.* at *7.

Defendants moved to reconsider the Court's denial of the motion with regard to counts 2, 3, and 4, or, alternatively, to certify the dismissal of those claims for interlocutory appeal.  Following a hearing on July 14, 2010, the Court denied the motion

with regard to counts 2 and 4. On count 2, the motion to reconsider asserted that the Court's reading of IRPA ran afoul of the First Amendment. The Court concluded that defendants had not asserted this argument in their motion to dismiss and therefore could not raise the issue on a motion to reconsider. On count 4, the Court concluded that defendants' disagreement with the Court's ruling did not provide an appropriate basis for reconsideration. After requesting and reviewing additional submissions from the parties, the Court denied the motion to reconsider as to count 3 and defendants' request to certify dismissal of the claims for interlocutory appeal. *Best v. Malec*, No. 09 C 7749, 2010 WL 3721475 (N.D. Ill. Sept. 14, 2010).

Best then filed a first amended complaint naming Boutique TV, Inc. as a defendant and terminating defendant Good Luck Nat, Inc. Defendants have moved to dismiss count 2 of the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and have now squarely presented the First Amendment argument that the Court concluded they had not made in their motion to dismiss the original complaint. Defendants have also moved for summary judgment on counts 2, 3, and 4 on statute of limitations grounds.

## Discussion

When considering a motion to dismiss a complaint under Rule 12(b)(6), the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive the motion, the complaint must include enough facts to state a claim for relief that is plausible on its face.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

In count 2, Best alleges that the media defendants violated IRPA, which prohibits the use of an individual's identity for commercial purposes without her written consent. 765 ILCS 1075/30. IRPA defines a commercial purpose as "the public use or holding out of an individual's identity (I) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. IRPA exempts from liability the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." 765 ILCS 1075/35(b)(2). Best contends that defendants violated IRPA by using her identity without her consent for a commercial purpose, namely, the sale of the *Female Forces* television program.

Defendants argue that the First Amendment precludes the application of IRPA to *Female Forces*. On that basis, they urge the Court to interpret IRPA so that it does not conflict with the First Amendment. Specifically, they urge the Court to rule that *Female Forces* used Best's identity for "non-commercial purposes" and that the show therefore comes within the exemption in section 35(b)(2).

In its previous decision in this case, the Court rejected defendants' argument that the broadcasting of Best's arrest on *Female Forces* did not satisfy the statutory "commercial purpose" requirement. *Best*, 2010 WL 2364412, at *3. The Court

7

reasoned that *Female Forces* is a for-profit broadcast on a network with commercial advertisements and that people pay for television service, including via subscriptions to cable channels such as the Biography Channel. *Id.* The Court did not address whether the First Amendment prohibited application of IRPA to the *Female Forces* episode because defendants had not raised that issue. *Id.* at *4. The Court now turns to that question, which defendants have squarely presented in their current motion.

The First Amendment can serve as a defense to a civil claim of the type that Best makes in this case. *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988). The constitutional prohibition against laws abridging freedom of the press "greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people want very much to conceal." *Haynes v. Alfred A. Knopf*, 8 F.3d 1222, 1232 (7th Cir. 1993). The Supreme Court has "repeatedly held that if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 527-28 (2001) (citations and internal quotation marks omitted). The same standard, of course, applies to broadcasts; *Bartnicki* concerned a radio broadcast. *See id.* at 518, 527-35.

The First Amendment's "core purposes" are implicated when the government – either directly or through a legal standard that imposes civil liability – "imposes sanctions on the publication of truthful information of public concern." *Id.* at 533-34. In such cases, "privacy concerns give way when balanced against the interest in

8

publishing matters of public importance." *Id.* at 534.

The question of whether speech involves a matter of public concern is an issue of law. *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009). "'[T]he boundaries of the public concern test are not well defined.'" *Snyder v. Phelps*, --- S. Ct. ---, No. 09-751, 2011 WL 709517, at *6 (Mar. 2, 2011) (quoting *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam)). That said, "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 2011 WL 709517, at *6. To determine whether speech is of public or private concern, courts must "examine the content, form, and context of th[e] speech, as revealed by the whole record." *Id.* (citations and internal quotation marks omitted). "[N]o factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.*

"The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public." *Cox Broad. Co. v. Cohn*, 420 U.S. 469, 492 (1975). The matters defendants broadcast in this case do not, of course, involve court proceedings or charges that were, at the time of the events they depicted, even pending before a court. But although there is no controlling authority, and other authorities are relatively sparse, courts have repeatedly held that information about arrests rises to the level of public concern. *See, e.g.*, *Bowley v. City of Uniontown Police Dep't*, 404 F.3d 783,

9

787-88 (3d Cir. 2005) (fact of minor's arrest for rape); *Penwell v. Taft Broad. Co.*, 13 Ohio App. 3d 382, 384, 469 N.E.2d 1025, 1027-28 (1984) (videotape footage of drug arrest); *Detroit Free Press, Inc. v. Oakland County Sheriff*, 164 Mich. App. 656, 665-66, 418 N.W.2d 124, 128 (1988) (booking photographs of bank robbery arrestee); *Williams v. KCMO Broad. Division-Meredith Corp.*, 472 S.W.2d 1, 3-6 (1971) (videotape footage of robbery arrestee); see also Restatement (Second) of Torts, § 652D cmt. f ("Those who commit crime or are accused of it . . . may make every possible effort to avoid [publicity], but they are nevertheless persons of public interest, concerning whom the public is entitled to be informed."). The Court has found no contrary authority. The Court therefore agrees with defendants that their depiction of Best's arrest and its surrounding circumstances – including the computer screen shots giving information about prior arrests or citations – conveyed truthful information on matters of public concern protected by the First Amendment.

The status of *Female Forces* as an entertainment program, as opposed to a pure news broadcast, does not alter the First Amendment analysis. As the Supreme Court recognized in *Winters v. New York*, 333 U.S. 507 (1948), "[t]he line between the informing and the entertaining is too elusive for the protection of th[e] basic right" of a free press. *Id.* at 510; see also *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977) ("There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news."); *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986) ("Cable television partakes of some of the aspects of speech and the communication of ideas

as do the traditional enterprises of newspaper and book publishers, public speakers, and pamphleteers.").

Best counters that her arrest for the "de minimis" crime of driving under a suspended license was not a matter of public concern. Pl.'s Resp. to Defs.' Mot. to Dismiss First Am. Compl. 7. She notes that courts have previously held arrests to constitute matters of public concern only in the case of violent and serious offenses. Though Best's argument has some force, the Court finds no authority to support drawing this sort of distinction in determining the First Amendment's application.

The Court notes that it is relatively commonplace for newspapers to reprint "police blotter"-type information involving arrests. It is likewise common for television news broadcasts to report information about arrests and arrestees and even to depict arrestees being taken to or from a police station or a court. It is difficult to conceive an interpretation of the First Amendment that would not protect the reporting or broadcasting of this sort of information. *Female Forces*, of course, is not a news show as such. The fact remains, however, that it depicted, in Best's case, an arrest on criminal charges and facts concerning prior arrests or citations. These are legitimate matters of public concern, even if Best's encounters with the police involved conduct that was arguably toward the lower end of the spectrum of criminality.

With these principles in mind, the Court turns to defendants' argument regarding the construction of IRPA. Federal courts generally "interpret laws consistent with their meaning, but with an eye towards avoiding exposing any constitutional infirmities." *Dean Foods Co. v. Brancel*, 187 F.3d 609, 614 (7th Cir. 1999). Illinois adheres to this canon as well. *See, e.g.*, *In re Estate of Poole*, 207 Ill. 2d 393, 409, 799 N.E.2d 250,

259 (2003) (recognizing the court's "duty to construe a statute in a manner that upholds its validity and constitutionality if it can reasonably do so") (citing *People v. Fisher*, 184 Ill. 2d 441, 448, 705 N.E.2d 67, 72 (1998)); *see also Leopold v. Levin*, 45 Ill. 2d 434, 441-46, 259 N.E.2d 250, 254-57 (1970) (interpreting common law privacy tort to avoid First Amendment infirmity).

The Court therefore considers whether it may interpret IRPA's "non-commercial purpose" exemption consistent with its meaning but with any eye toward avoiding a First Amendment violation. As discussed earlier, IRPA exempts from liability the "use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign." This exemption – particularly in reference to "public affairs" – reasonably may be interpreted to cover the use of Best's identity in an entertainment program that conveys truthful footage of an arrest and thus implicates a matter of public concern. The Court accordingly grants defendants' motion to dismiss count 2 and concludes that defendants' broadcast of the *Female Forces* episode is exempt from IRPA's coverage.

The First Amendment analysis that the Court has applied to Count 2 likewise warrants a similar outcome for Best's claims for invasion of privacy (count 3) and intentional infliction of emotional distress (count 4). *See Snyder*, 2011 WL 709517, at *5; *Hustler Magazine, Inc.*, 485 U.S. at 50-51. Rather than dealing immediately with defendants' motion for summary judgment on those claims, which presents difficult issues of interpretation of an Illinois statute, the Court directs plaintiff to show cause in writing why the Court should not enter judgment against her on counts 3 and 4. Plaintiff's submission is to be made on or before by March 17, 2011. Defendants may

file a reply on or before March 31, 2011.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to dismiss count 2 of the first amended complaint [docket no. 63]. The case is set for a status hearing on April 6, 2011 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 3, 2011