IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERAN BEST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09 C 7749 |
| | ) |
| STACEY BERARD f/k/a STACEY MALEC, | ) |
| TIMOTHY BOOGERD, CITY OF | ) |
| NAPERVILLE, A DAY WITH, INC., | ) |
| BOUTIQUE TV, INC., and A&E TELEVISION | ) |
| NETWORKS, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Eran Best has sued the City of Naperville, two Naperville police officers, and several television production companies on claims arising from her arrest and resulting involuntary appearance on the television show *Female Forces*. Best claims that her arrest and the show's depiction of her personal information violated her federal constitutional rights to privacy and against unreasonable search and seizure. She also claims that defendants disclosed information about her in violation of the Driver's Privacy Protection Act (DPPA), 18 U.S.C. § 2722(a). Best previously asserted a number of state claims, which the Court dismissed in its previous decisions in this case. *See Best v. Berard*, 776 F. Supp. 2d 752 (N.D. Ill. 2011); *Best v. Malec*, No. 09 C 7749, 2010 WL 3721475 (N.D. Ill. Sept. 14, 2010); *Best v. Malec*, No. 09 C 7749, 2010 WL 2364412 (N.D. Ill. June 11, 2010).

Defendants have moved for summary judgment on Best's remaining claims. For the reasons stated below, the Court grants the motion in part and denies it in part.

**Facts**

On a motion for summary judgment, the Court construes all facts favorably to the nonmoving party and makes reasonable inferences in that party's favor. *Bagley v. Blagojevich*, 646 F.3d 378, 388 (7th Cir. 2011). The Court takes the following facts from the parties' memoranda of law and statements of uncontested facts and from its review of a recording of the relevant portion of the television episode in question.

Defendant A Day With, Inc. (ADW) produced a television show called *Female Forces* that aired on the Biography Channel. The Biography Channel is owned by defendant A&E Television Networks, LLC (A&E). Best asserts that defendant Boutique TV, Inc. was involved with the production of *Female Forces*, although the company was known by a different name at the time. Defendants deny that Boutique TV was involved.

*Female Forces* was an unscripted "reality" television series that followed female police officers as they performed their duties and interacted with members of the public. The City of Naperville participated in the *Female Forces* program pursuant to a city resolution authorizing it to enter into a contract with ADW. Naperville's police chief, David Dial, instructed police officers not to let filming interfere with their work in any way. The city's contract also gave the Naperville Police Department the right to review a rough cut of each episode of the show and to insist on removal of material from the episode. Dial, an A&E programming director, and a *Female Forces* "clearance

supervisor" reviewed a rough cut of the pertinent episode before it aired, and the programming director and clearance supervisor also reviewed a final cut.

On February 24, 2008, Best was driving in Naperville. Defendant Timothy Boogerd, a Naperville police officer, saw from his squad car that Best's license plate had an expired sticker. He ran her license plate through the Illinois Secretary of State's database and saw that the car's registration had been suspended. He then pulled Best's car over at 11:08 p.m.[1] After pulling Best over, Boogerd approached her car and spoke to her. He later testified that he smelled alcohol when he did so. He asked Best if she had had anything to drink, and she replied that she had consumed one beer earlier in the evening. Boogerd then requested Best's driver's license. She handed him her Illinois state identification card, which he took back to his vehicle. He checked Best's driver record information and learned that her driver's license had been suspended.

While Best waited in her car, with the heat running, Boogerd requested that another officer come to the scene. Naperville police procedures require the presence of two officers during a sobriety test and encourage the presence of two officers during an arrest. The parties dispute how Boogerd's request occurred. Defendants contend that a police dispatcher contacted Boogerd at 11:13 p.m. for a status check and that Boogerd requested a back-up officer at that time. Best asserts that there is no record of any such request by Boogerd and contends that he contacted Stacy Berard, a female Naperville officer who was being accompanied by a *Female Forces* camera crew, by

---

[1]The times come from Naperville police records, which Best does not suggest are inaccurate.

some other means.[2] One way or another, it is undisputed that Berard and a camera crew arrived on the scene at 11:17 p.m.

After Berard and the camera crew arrived, Boogerd again asked Best if she had had anything to drink, and she replied that she had consumed one beer. Either before or after asking this question, Boogerd and Berard approached Best's car and directed her to get out. Boogerd performed two field sobriety tests on Best. The first test was a "horizontal gaze nystagmus" test. He then asked her to recite a portion of the alphabet. He determined after administering these tests that she did not exhibit any signs of impairment. Boogerd and Berard then informed Best that she was driving on a suspended driver's license and placed her under arrest at 11:27 p.m. Berard handcuffed Best, patted her down, and placed her in the back of Boogerd's squad car. Boogerd and Berard then proceeded to search Best's car. After they completed the search, Boogerd began driving Best to the Naperville police station at 11:34 p.m.

Footage of events surrounding Best's arrest was broadcast during an episode of *Female Forces*. The segment depicts the sobriety tests and Best's arrest, including the moment when she is placed in handcuffs. Best's face is visible, and her voice is audible throughout the scene. The segment also includes scenes in which Best is not on camera. One scene shows Berard in her squad car driving to the scene, speaking directly to the camera. At one point during this sequence, the camera focuses on a dashboard computer. The computer displays the name "Erin Best," as well as Best's date of birth, height, weight, and driver's license number, a phone number, and brief

---

[2] At the time, Berard's last name was Malec.

4

descriptions of previous arrests and traffic stops.

Another scene shows Boogerd and Berard searching Best's car while bantering about her expensive tastes. Berard says that Best likes Coach purses, bags, and shoes, and Boogerd comments that Best was driving a Jaguar. After the scene showing Best's arrest, the camera again films Berard in her squad car, and she says, "Do I feel sorry for [Best]? No. Pretty little blond girl, 25 years old, driving a Jaguar - yeah, that's Naperville."

The *Female Forces* episode featuring Best was first broadcast on the Biography Channel on December 7, 2008. Best filed suit against defendants on December 14, 2009. Defendants have moved for summary judgment on all remaining counts of Best's complaint.

## Discussion

Summary judgment is proper when the moving party shows that there is no genuine dispute over any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when, based on the record, a reasonable fact finder could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. *Outlaw v. Newkirk*, 259 F.3d 833, 836-837 (7th Cir. 2001).

**A.    Constitutional claims**

    **1.    Right to privacy**

Best alleges that defendants violated her constitutional right to privacy by

broadcasting the information contained on the computer screen in Berard's squad car. She cites the Seventh Circuit's recognition of a "constitutional right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information - information that most people are reluctant to disclose to strangers," which the court has noted is "defeasible only upon proof of a strong public interest in access to or dissemination of the information." *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010). Defendants respond that none of the information actually aired is protected by a constitutional privacy right.

The information displayed in the episode consisted of the name "Erin Best," Best's date of birth, height, weight, and driver's license number, a phone number, and brief descriptions of Best's previous arrests and traffic stops. The depiction of information concerning Best's previous arrests and stops does not violate her constitutional right to privacy because the disclosure of a criminal record does not violate that right. *See Doe v. City of Chicago*, 360 F.3d 667, 672 (7th Cir. 2004) (noting that the "right . . . to prevent the publicizing of one's criminal history" is "now defunct"). Best does not expressly argue otherwise. She also concedes that she did not use, receive bills for, or live at the residence corresponding to the phone number that aired, and she does not dispute defendants' claim that the number was therefore not her private information. Rather, Best focuses in her brief on the display of her height, weight, and driver's license number.

With respect to Best's height and weight, the Seventh Circuit has recognized that "medical information may be a form of protected confidential information because of its intimate and personal nature." *Denius v. Dunlap*, 209 F.3d 944, 957 (7th Cir. 2000).

6

The wording throughout *Denius*, however, indicates that the court considers "medical information" to involve "medical records and communications," not every piece of information that might be disclosed about a person's body. *See id*. at 956; *see also Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 566 (7th Cir. 2009) (citing the "constitutional right to the confidentiality of medical records and communications"); *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995) (citing the "right to conceal one's medical history"). Best understandably may not want to disclose her height and weight to strangers, but the categories of information that the Seventh Circuit has deemed protected by the constitutional privacy right have been far more personal, such that their disclosure would lead to greater potential for embarrassment or abuse. *See, e.g.*, *Anderson*, 72 F.3d at 523 (HIV status); *Schaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1322 n.19 (7th Cir. 1989) (use of prescription drugs). The Court concludes that information disclosing one's height and weight is not protected under a constitutional privacy right.

Defendants argue further that Best has no right of privacy in her driver's license number because it is publicly available information. Best responds that *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 764 (1989), forecloses this argument because of its holding that a "compilation of otherwise hard-to-obtain information" may be entitled to heightened privacy protection even though it is comprised only of "public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country." She argues that the information displayed on the screen in Berard's car

7

amounted to this sort of compilation and is therefore protected. Defendants correctly point out, however, that *Reporters Committee* interpreted the Freedom of Information Act and therefore "tells us only when something is private under a statute, not whether a person has an expectation of privacy under the United States Constitution." *United States v. Cuevas-Perez*, 640 F.3d 272, 284 (7th Cir. 2011) (Flaum, J., concurring). Best does not dispute that her driver's license number is otherwise publicly available, and she does not identify any other basis for a contention that she has a constitutionally protected privacy interest in it.

For these reasons, the Court concludes that Best does not have a constitutionally protected privacy interest in the information aired on *Female Forces*. The Court therefore grants defendants' motion for summary judgment on Best's constitutional right to privacy claim.

### 2. Fourth Amendment

Best claims that the defendant officers violated her Fourth Amendment rights by unreasonably delaying her arrest. First, she alleges that Boogerd forced her to wait an unreasonably long time while he contacted Berard directly instead of calling police dispatch for backup and that he did this because he knew Berard would be accompanied by the camera crew. Second, Best alleges that after Berard arrived, the procedures that the officers used, particularly the sobriety tests, were "staged" for the benefit of the cameras and therefore added further unnecessary time to her detention.

#### a. **Unreasonable delay**

The Supreme Court held in *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), that "a

8

seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." A "detention following a traffic stop, like any seizure, must satisfy the Fourth Amendment's requirement of reasonableness." *United States v. McBride*, 635 F.3d 879, 882 (7th Cir. 2011). The Seventh Circuit has, however, "distinguished stops based on probable cause from those based on reasonable suspicion. . . . Because a stop based on probable cause will also justify a custodial arrest, a driver detained during such a stop has no right to expeditious release." *Id*. (citing *United States v. Childs*, 277 F.3d 947, 952-53 (7th Cir. 2002) (en banc)).

Best does not dispute that before pulling her over, Boogerd correctly believed that her license plate had expired and that her registration had been suspended. Boogerd therefore had probable cause to believe that Best had committed a traffic violation, and Best was not entitled to be released "as quickly as possible." *See Childs*, 277 F.3d at 952.

This does not mean that there were no constitutional limits on the duration of the stop. "What the Constitution requires is that the entire process remain reasonable." *Id*. at 954. Boogerd may have already had all the information he needed regarding the issues that provided probable cause for the stop in the first place by the time he first approached Best's car. But even if that is so, "further questioning is permitted and will not render the stop unreasonable so long as the officer asks 'questions that hold the potential for detecting crime, yet create little or no inconvenience.'" *McBride*, 635 F.3d at 882 (quoting *Childs*, 277 F.3d at 954).

Best contends that she was held at the side of the road for an unreasonable length of time solely to serve the interests of an entertainment program and that this constituted an unreasonable delay because it was not plausibly related to the investigation of a crime. Best offers the following to support her contention that Boogerd improperly made her wait to allow the camera crew to arrive. Boogerd was patrolling within Berard's "beat," or assigned area. After pulling Best over at 11:08 p.m., he did not check in with police dispatch until 11:13, and no officer was sent to him by dispatch. Instead, Berard arrived four minutes later, at 11:17, without being contacted by headquarters. Stacy Edwards, Emergency Communications Supervisor for Naperville, testified that, based on police communications records, her best explanation was that Berard had joined Boogerd without communicating with dispatch. Edwards Dep. at 49:9-19. It is reasonable to infer that Boogerd contacted Berard directly.

The Court assumes for purposes of discussion that Best is correct that Boogerd contacted Berard directly so that the *Female Forces* camera crew could film the encounter between the police and Best. Even if that is so, however, Best's detention was not prolonged in a way sufficient to constitute unreasonable delay violative of the Fourth Amendment. The parties agree that Naperville police policy strongly encourages the presence of two officers for any arrest, and Best has offered no basis upon which a reasonable jury could find it unreasonable for Boogerd to call for backup. Only nine minutes elapsed between the time Best was pulled over and Berard's arrival at the scene. And not all of this is attributable to Boogerd calling for backup; the nine minutes includes the time it took for Boogerd to approach Best's car, speak with her, and run her license, all of which he would have done one way or the other. In any

event, Best has offered no evidence from which a reasonable jury could find that she would have been detained for less time prior to her arrest if Boogerd had called dispatch for backup rather than calling Berard directly.  For these reasons, no reasonable jury could find an unreasonable delay.  *See McBride*, 635 F.3d at 882 ("The additional questioning here did not amount to an inconvenience, adding only minutes to the stop.").

If Boogerd in fact called Berard directly to enable the episode to be filmed, that obviously was not a commendable motivation.  Many reasonable people, not to mention many professional law enforcement personnel, reasonably could be dismayed by a police officer's or police department's exploitation of the serious business of real-life law enforcement for its entertainment value.  *See Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 390 (S.D.N.Y. 2008) (finding that a complaint plausibly asserted a Fourth Amendment violation for police actions that were "motivated not by a genuine law enforcement need, but by [the desire of a television program filming them] for more sensational footage").  And the officers' sarcastic voice-over commentary was unnecessarily denigrating of Best and reflected a rather unprofessional flippancy.  But these factors, without more, do not render the stop unconstitutional.  "[T]he constitutional reasonableness of a traffic stop does not depend on the subjective motivations of the individual officer involved."  *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).  "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action."  *Scott v.*

11

*United States*, 436 U.S. 128, 138 (1978).

### b. The field sobriety tests

Best also argues that the officers administered the field sobriety tests unnecessarily. In support, she argues, correctly, that the only undisputed fact supporting the officers' administration of the tests was her admission that she drank one beer earlier in the evening. (The veracity of Boogerd's testimony that he smelled alcohol on Best's breath is genuinely disputed.) At least one circuit has held, however, that a suspect's statement that he had one beer three hours earlier provided "arguable reasonable suspicion" that justified a field sobriety test and entitled the administering officer to qualified immunity. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008). On the other hand, an argument can be made that if this was all the officers had, it was insufficient for a reasonable jury to conclude that the officers had reasonable suspicion justifying administration of the sobriety tests. *See Bernardi v. Klein*, 682 F. Supp. 2d 894, 903 (W.D. Wis. 2010) (finding that plaintiff's admission of one drink was insufficient for reasonable suspicion).

Reasonable suspicion, however, is not the issue here. Best argues that because the tests were not properly justified, their administration caused an unreasonable delay. This argument fails for the same reasons as Best's claim regarding the period before Berard's arrival: she has not offered evidence from which a reasonable jury could find that the tests added enough time to her detention to constitute unreasonable delay. The tests were filmed, and on the episode as aired they took less than a minute. Even if the segment was edited down, and even if the officers took extra time to prepare to

12

administer the tests, only a total of ten minutes elapsed between Berard's arrival at the scene and Best's arrest. Best has not introduced any evidence from which a reasonable jury could conclude that the testing lengthened her detention beyond what was constitutionally reasonable.

For these reasons, defendants are entitled to summary judgment on Best's Fourth Amendment claim.

**B.    DPPA**

Best argues that the information shown in close-up on Berard's vehicle screen was improperly disclosed in violation of the DPPA. The DPPA creates a private cause of action against a "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter." 18 U.S.C. § 2724(a). "Personal information" is defined as "information that identifies an individual, including an individual's photograph, social security, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." *Id*. § 2725(3). Defendants do not argue that the airing of *Female Forces* constituted a permitted purpose. Rather, they contend that the information displayed was not from a motor vehicle record and that the disclosure was not made knowingly.

As a threshold matter, defendants contend throughout their brief that the information on the screen is not truly legible. After reviewing a recording of the episode, the Court disagrees. Although the information on the screen is visible only briefly, it is displayed clearly, and anyone who recorded the episode could easily pause it and

13

review the information.

Defendants also point out that Best's first name is misspelled by one letter. Despite this, a reasonable jury could find that the totality of the information displayed was information that identified Best. As such, a reasonable jury could find that it was "information that identifies an individual" and thus "personal information" under the DPPA.

Defendants also argue that they cannot have violated the DPPA because the statute's prohibitions apply only to departments of motor vehicles and not to any other entity that might disclose the protected information. The Court disagrees. The statute refers specifically to a "*person* who . . . discloses or uses personal information" and does not limit this to departments of motor vehicles. 18 U.S.C. § 2724(a) (emphasis added); *see also Luparello v. Incorporated Vill. of Garden City*, 290 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("To establish a claim under the DPPA, the plaintiff must establish . . . that the defendants caused a DMV search to be made as to each plaintiff."); *Ocasio v. Riverbay Corp.*, No. 06-6433, 2007 WL 1771770, at *5-6 (S.D.N.Y. June 19, 2007). Based on the plain wording of the statute, the Court declines to follow the non-binding cases cited by defendants that have held to the contrary.

Under the DPPA, a "motor vehicle record" is "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Defendants argue that the Court should adopt the interpretation of this definition used in *Mattivi v. Russell*, No. 01 C 533, 2002 WL 31949898, at *4 (D. Colo. 2002), in which the court

held that the DPPA covers only "records issued by a department of motor vehicles" and does not include a police report that contained a driver's license number. Defendants contend that there is no evidence from which a reasonable jury could find that the information on the screen originated in a Secretary of State database (which they do not dispute would qualify as a "motor vehicle record" under the statute) rather than from Naperville Police Department records. Best argues for a more expansive conception of "motor vehicle record."

The Court need not determine at this point which standard is the correct one. Best has provided sufficient evidence to defeat summary judgment even under defendants' stricter definition. Defendants argue, and Best agrees, that the "height and weight information on the Screen differs from the Secretary of State's records, and the Secretary of State does not keep a record of phone numbers." Def.'s L.R. 56.1 Stmt. ¶ 53. However, the testimony of Craig Turton of the Secretary of State's driver services department, read favorably to Best as required on summary judgment, would support a finding that at least some of the information depicted on the computer screen was from the Secretary of State's database. Turton Dep. 14:17-15:1. Though the testimony of Turton and that of Chavonne Carter of the Secretary of State's vehicle services department indicates that this information was displayed in a format different from the way it is shown in the Secretary of State's database, that would not preclude a finding that the information displayed came from that database. A reasonable jury therefore could find from this evidence that the information on the screen came from a motor vehicle record as the DPPA defines that term.

Defendants also contend that the airing of the episode did not constitute

disclosure under the statute because they did not know that they were airing Best's personal information or that it would be prohibited under the DPPA. The Seventh Circuit recently construed "knowingly" under the DPPA to "mean[] that the defendant realized what he was doing and was aware of the nature of his conduct." *Senne v. Vill. of Palatine, Ill.*, 645 F.3d 919, 923 (7th Cir. 2011), *vacated*, *reh'g en banc granted* (7th Cir. Sept. 13, 2011). Although that opinion was vacated for rehearing, at least two other courts have found similarly. *See, e.g.*, *Rios v. Direct Mail Express, Inc.*, 435 F. Supp. 2d 1199, 1205 (S.D. Fla. 2006) ("[T]he term 'knowingly' only modifies the phrase 'obtains, discloses, or uses personal information' . . . not . . . 'for a purpose not permitted.'"); *Pichler v. UNITE*, 228 F.R.D. 230, 242 (E.D. Pa. 2005). The Court agrees with these cases and concludes that the DPPA requires only a deliberate act constituting disclosure, not knowledge that the disclosure was legally forbidden. That is the standard definition of "knowing" conduct, *cf.* Pattern Crim. Jury Instructions for the Seventh Circuit § 4.06 (1998) (defining "knowingly"), and there is no basis to think that Congress established a stricter standard in the DPPA.

Defendants maintain, nonetheless, that they did not know that Best's personal information was being aired. They argue that the information appeared in the episode for too brief a period of time to be readable. The Court has already explained why this is not so. The Court agrees, however, that Boogerd and Berard cannot reasonably be held to have knowingly disclosed the information for airing during the episode because there is no evidence that they were involved with the production of the episode to be broadcast. On the other hand, a reasonable jury could conclude that the other defendants, who had the opportunity to review versions of the episode before it was

16

aired, knew that it contained a depiction of Best's personal information.[3]

The Court therefore grants summary judgment in favor of Boogerd and Berard on Best's DPPA claim but denies the motion with respect to all other defendants.

**C.     Boutique TV**

Defendants claim that Boutique TV had no involvement in any aspect of the making of *Female Forces*. Best contends that Boutique TV was involved with the show, although the company was under a different name at the time. Her complaint indicates that she believes that Boutique TV was formerly known as "The Greif Company."

Defendants offer an affidavit by Jennifer Rubino, the current Executive in Charge of Boutique TV and ADW. The affidavit says, "Boutique TV did not exist at the time when Female Forces was in production. Therefore, Boutique TV was not involved with the production of Female Forces." Rubino Dec. ¶¶1-2.

At her deposition, Rubino testified under oath that she has been employed by Boutique TV for ten years but that the name of the company has changed. It was known as A Day With until approximately November 2009. She then noted that she would have to "ask our legal" about whether the change resulted in a completely new company or just a new name. Rubino Dep. 6:10-23.

The record regarding Boutique TV is sparse and contains conflicting information. The Court cannot say, based on the record as it exists, that no reasonable jury could find that an entity called Boutique TV, under a former name, was involved in the

---

[3]Defendants argue that they only reviewed a "rough cut" of the episode. After review of the relevant portion of the rough cut, the Court finds that although the information on the screen is blurrier than in the final version, it still would be sufficient to put a viewer on notice that the information would appear in the actual episode.

production of *Female Forces*. The Court therefore declines to grant summary judgment in favor of Boutique TV.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment in part and denies it in part [docket no. 175]. Summary judgment is granted in favor of defendants Stacy Berard and Timothy Boogerd on all remaining claims and in favor of all other defendants on count 1. The motion is otherwise denied. The case is set for a status hearing on November 22, 2011 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 15, 2011